REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| STEVE SLAVENS, FRANK SLAVENS and KEVIN LEVY, individually and as representatives of a class of participants and beneficiaries on behalf of the Meritor 401(k) Plan, | Case No. 2:20-cv-13047 |
|  | Hon. David M. Lawson |
|  | Mag. Anthony P. Patti |
| Plaintiffs, |  |
| v. |  |
|  | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| MERITOR INC., the BOARD OF DIRECTORS OF MERITOR, INC., the MERITOR, INC. EMPLOYEE BENEFITS PLAN COMMITTEE, MIKE LEI, TIMOTHY HEFFRON, and JOHN DOES 1-30, |  |
| Defendants. |  |

Plaintiffs Steve Slavens, Frank Slavens, and Kevin Levy ("Plaintiffs"), by and through their attorneys, on behalf of the Meritor, Inc. Savings Plan (the "Plan"),[1] themselves and all others similarly situated, allege as follows:

---

[1] The Plan is a legal entity that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the case law interpreting it, the relief sought in this action is for the benefit of the Plan, its participants and beneficiaries.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## **INTRODUCTION**

1.     This is a class action brought pursuant to §§ 406, 408, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1106, 1108, 1109 and 1132, against the Plan's fiduciaries, which include Meritor, Inc. ("Meritor" or the "Company"), the Board of Directors of Meritor ("Board") and its members during the Class Period (defined below), and the Employee Benefits Plan Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion** was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, R*etirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.     In a defined *contribution* plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).  Because all risks related to high fees and poorly performing investments are borne by the participants, the

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

employer has little incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent.

4.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019), *cert. denied sub nom. Univ. of PA v. Sweda*, No. 19-784, 2020 WL 1496631 (U.S. Mar. 30, 2020). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participants are ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

6.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

7.     As of December 31, 2019, the Plan had more than $616 million in assets, and as of December 31, 2018, the Plan had more than $506 million in assets.[2] As a large plan, the Plan has substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, instead of leveraging the Plan's bargaining power to benefit participants and beneficiaries, Defendants chose poorly performing investments, inappropriate, high-cost mutual fund share classes, and caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

8.     The Plan's assets are entrusted to the care of Defendants, who are the Plan's fiduciaries, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). To the extent that Defendants made any attempt to reduce the Plan's expenses or to monitor and review the Plan's investment options, Defendants

---

[2] Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50 million-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

4

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

employed flawed and ineffective processes, which failed to ensure that: (1) the fees and expenses charged to Plan participants were reasonable, and (2) that each investment option that was offered by the Plan was prudent.

9.     Instead, Defendants breached the fiduciary duties to the Plan and its participants, in violation of 29 U.S.C. § 1104, by: (1) selecting and retaining certain funds in the Plan despite the availability of virtually identical or similar investment options with lower costs and/or better performance histories; (2) failing to select the lowest cost share class for the funds within the Plan; and (3) under-utilizing collective trusts and separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

10.    The Plan's imprudent investment options during the Class Period include: (1) T. Rowe Price Target date Retirement Funds; (2) T. Rowe Price Mid-Cap Growth Fund; (3) T. Rowe Price Growth & Income Fund; and (4) T. Rowe Price Growth Stock Fund.

11.    Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duties of prudence and loyalty and cost the Plan and its participants millions of dollars. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## JURISDICTION AND VENUE

12.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

13.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place and where Defendants reside.

## STANDING

15.     An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *LaRue*, 552 U.S. at 254. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained below, the Plan suffered

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and suffered financial harm as a result of the imprudent investment options in the Plan, because Defendants' selection and retention of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

17.     Plaintiffs' individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings. In addition, Plaintiffs were forced to pay excessive recordkeeping and administrative fees.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

18.    Plaintiffs are entitled to receive damages in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

## PARTIES

### Plaintiffs

19.    Plaintiff Stephen Slavens resides in Clover, South Carolina. During his employment with Meritor, Inc., Plaintiff Stephen Slavens participated in the Plan, investing in the T. Rowe Price Retirement 2025.

20.    Plaintiff Frank Slavens resides in Clover, South Carolina. During his employment with Meritor, Inc., Plaintiff Frank Slavens participated in the Plan, investing in certain options offered by the Plan, including: T. Rowe Price Retirement 2020, T. Rowe Price Retirement 2025, T. Rowe Price Retirement 2030, T. Rowe Price Growth & Income, and TRP Stable Value Fund – N.

21.    Plaintiff Kevin Levy resides in Detroit, Michigan. During his employment with Meritor, Inc., Plaintiff Levy participated in the Plan, investing in the T. Rowe Price Retirement 2025 Fund.

22.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Plaintiffs did not and could not review the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## **Defendants**

23.     Defendant Meritor Inc. ("Meritor" or the "Company") is an Indiana corporation that maintains its principal executive offices at 2135 W. Maple Rd., Troy, Michigan 48084.

24.     Defendant Meritor is a global supplier of a broad range of integrated systems, modules and components to original equipment manufacturers ("OEMs") and the aftermarket for the commercial vehicle, transportation and industrial sectors. It serves commercial truck, trailer, military, bus and coach, construction, and other industrial OEMs and certain aftermarkets. Its principal products are axles, suspension systems, drivelines and brakes.

25.     Meritor is the Plan sponsor, administrator, and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Meritor is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

or control over management or disposition of Plan assets, and (c) it appointed Plan fiduciaries through Meritor's Board of Directors (the "Board"), or a committee of the Board, which was entrusted with the authority to control the management, operation and administration of the Plan.

26.    At all times relevant to this action, Meritor is a named fiduciary of the Plan and has been responsible for handling the day-to-day operations of the Plan. While the Company has delegated certain of its fiduciary responsibilities to the Committee and the Plan Administrator, it nonetheless remains a fiduciary of the Plan under ERISA.

## Board Defendants

27.    Each member of the Meritor Board of Directors during the putative Class Period (including, but not limited to, Jan A. Bertsch, Rodger L. Boehm, Rhonda L. Brooks, Thomas L. Pajonas, Steven Beringhause, Ivor J. Evans, William R. Newlin, and Lloyd G. Trotter) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

28.    Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

29.     On information and belief, the Board has discretion to authorize Meritor to contribute annual profit-sharing amounts to the Plan participants.

**Committee Defendants**

30.     On information and belief, Meritor has delegated certain administrative and investment related duties to the Committee and the Plan Administrator. The Plan Administrator and the members of the Committee are named fiduciaries of the Plan.

31.     The membership of the Committee is comprised of the Senior Vice President, Chief Financial Officer; Senior Vice President, General Counsel; Vice President, Human Resources; Vice President, Treasurer; and Senior Director, Compensation and Benefits.

32.     The Committee acts as a "Named Fiduciary" under ERISA with respect to the control and management of the Plan and provides oversight of the investments, service providers, and objectives of the Plan. The Committee's primary responsibilities with respect to the Plan are to:

- Make sufficient asset classes/investment options with different risk/return profiles available under the Plan so that each Plan participant has the opportunity to prudently diversify Plan accounts given investment circumstances;

- Establish and maintain the Investment Policy Statement;

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

- Ensure adequate controls are in place to account for all investment, recordkeeping, and administrative expenses associated with the Plan;

- Monitor investment options as to fund levels, returns, manager performance to establish benchmarks, and manager tenure;

- Remove investment options and/or managers not performing at acceptable levels; and

- Avoid prohibited transactions or conflicts of interest.

33.    Defendant Mike Lei ("Lei") has been Meritor's Vice President, Treasurer and Compensation & Benefits since April 2018, and he was the Senior Director, Compensation & Benefits from February 2014 until April 2018. On information and belief, Lei was a member of the Committee during the Class Period. In addition, Lei signed the Plan's forms 5500 filed with the U.S. Department of Labor on behalf of the employer or sponsor of the Plan for each year during the Class Period. Accordingly, Lei has served as a fiduciary of the Plan during the Class Period.

34.    Defendant Timothy Heffron ("Heffron"), has been Meritor's Senior Vice President, Human Resources and Chief Information Officer since 2016, and previously served as the Company's Vice President, Human Resources & Chief

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

Information Officer. On information and belief, Heffron was a member of the Committee during the Class Period.

35.   The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.   The Committee and the unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## Additional John Doe Defendants

37.   To the extent that there are additional officers and employees of Meritor who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 11-21 include, but are not limited to, Meritor officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## **THE PLAN**

38.     The Plan, established effective October 1, 1997, is a single-employer "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

39.     The Trustee for the Plan is T. Rowe Price Trust Company. *See* Meritor, Inc. Form 5500 for period ending December 31, 2018 filed with the U.S. Department of Labor (hereinafter "Form 5500"), Notes to Financial Statements at 4.

### **Eligibility**

40.     The Plan covers "eligible salaried and certain non-union hourly employees of Meritor, Inc. and other affiliated companies. Eligible employees may participate in the Plan immediately on the date they become employees." Form 5500 for December 31, 2018, Notes to Financial Statement at 4.

### **Contributions**

41.     Eligible employees may contribute up to 50% of their compensation per year, subject to limitations of the Internal Revenue Code (the "Code"). Such

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

contributions may be on a pre-tax or after-tax basis. Participants may also make rollover contributions from other qualified plans or IRAs. Participants direct the investment of their contributions into various investment options offered by the Plan. Meritor, Inc. Form 5500 for December 31, 2018, Notes to Financial Statements p. 4.

42.    The Plan offers primarily mutual funds as investment options for participants. It also offers a stable value fund and the Company's own common stock. Participant contributions are recorded on a cash basis which is the same as or approximates the period during which the Company makes payroll deductions from the participant's earnings.

43.    Eligible newly hired employees are automatically enrolled into the Plan 30 days after their hire date. Employees are enrolled with a default contribution rate of 3% of compensation but may contact the Plan administrator to opt out or change the election. Eligible employees who are making contributions of less than 6% of their compensation are enrolled in automatic escalation, which upwardly adjusts the contribution percentage by 1% each adjustment period until it reaches 6% The participant may affirmatively opt-out of the escalation. Form 5500 for December 31, 2018, Notes to Financial Statements, at 4.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

### The Plan's Investments

44.     Various funds were available to Plan participants for investment during the Class Period, including funds from T. Rowe Price, American Century, Blackrock, Dodge & Cox, Vanguard and Metropolitan West.

45.     On information and belief, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[3]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 13, 2014 and the present (the "Class Period").

47.     The members of the Class are so numerous that joinder of all members is impractical. According to the Form 5500 filed with the U.S. Department of Labor, as of December 31, 2019, there were 4,919 Plan participants with account balances.

48.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated

---

[3] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

49.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

50.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

51.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

53.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

54.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

55.    As described above, Defendants were fiduciaries of the Plan because:

(a)    they were so named; and/or

(b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

56.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

57.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).

58.     "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

59.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

60.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in  selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio."  *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

61.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission

of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

62.     During the Class Period, Defendants did not act in the best interests of the Plan participants. Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

63.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options and for recordkeeping and administrative services. Additionally, Defendants failed to exercise diligence in selecting and monitoring Plan investment options.

64.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co- fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## SPECIFIC ALLEGATIONS

### Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

65.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

66.     The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[4]

---

[4] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Mar. 24, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

67.     As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

68.     The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year,4 at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%,5 the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.*

69.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[5] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor

---

[5] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited Mar. 24, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

70.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*.

71.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[6] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

72.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons

---

[6] Available at: https://www.ici.org/pdf/per24-04.pdf (last visited Mar. 24, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place[s] funds in a given category based on their portfolio statistics and compositions over the past three years."[7]

73.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id.* at 10. This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id.* at 1.

74.    Other industry experts have also taken note of this trend, observing: "On average, the fees 401(k) participants pay for funds that invest in stocks fell from 0.77% of assets in 2000 to 0.74% in 2009, before dropping sharply to 0.54% in 2014, according to ICI, a mutual-fund-industry trade group. Fee reductions have also

---

[7] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited Mar. 25, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

accelerated on bond funds and a hybrid category that includes popular all-in-one target-date funds." Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, THE WALL STREET JOURNAL (May 15, 2016).

75.   Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

### 1.   Passively Managed Funds Cost Less Than Actively Managed Funds

76.   Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 575 U.S. 523 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law. *Varity Corp.*, 516 U.S. at 496–97.

77.   Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and

27

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1) (2012). The relevant factor that may be considered include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

78.     Here, each investment option within the Plan charged certain fees that are paid by deductions from the pool of assets held by the Plan. For passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

79.     By contrast, the Plan's actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, have caused the Plan to pay higher fees in order to compensate the fund managers and their associates for the work associated with stock picking.

80.     While higher-cost mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in The Washington Post, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study by S&P Dow Jones Indices, which analyzed 2,862 actively managed mutual domestic stock mutual funds over a five-year period, found that "just two funds...managed to hold on to their berths in the

28

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[8] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index funds trounce actively managed funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[9]

81.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

82.    Here, the Plan is dominated by expensive actively managed funds, including 18 funds from T. Rowe Price, which domination reflects a flawed fiduciary

---

[8] Available at: https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited Mar. 25, 2020).
[9] Available at https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited Mar. 25, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

process. The Plan presently includes only two lower-cost passively managed index funds, the Vanguard Institutional Index Fund and the Total Intl Stock Index Fund.

83.     As shown in the charts below, the selection of these actively managed funds for the Plan was imprudent because the chosen actively managed funds had high expense ratios and rarely, if ever, performed any better than far less expensive passively managed index funds.

## 2.     Institutional Share Classes Cost Less Than Investor Share Classes

84.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

85.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

to its menu of designated investment options. Thus, a fiduciary of a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select only the lowest-priced share class available.

86.     The availability of lower-cost institutional class shares for large defined benefit plans has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, InvestmentNews.com (Feb. 18, 2016).[10]

87.     Indeed, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble v. Edison*

---

[10]  Available  at:  https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited Oct. 21, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

*Int'l.*, No. 07-cv-5359 SVW (AGRx), slip op. at 13 (C.D. Cal. Aug. 16, 2017). Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plan.

88.    Here, as demonstrated in the "Share Class and Collective Trust Chart" below, either a lower cost institutional share class or a collective trust, both of which performed the same or better than the higher-cost share class in which the Plan's funds were invested, was available for each of the T. Rowe Price funds included in the Plan.

### 3.    Defendants Underutilized Collective Trusts and Separate Accounts as Investment Options for the Plan

89.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives than even institutional and 401(k) plan specific shares of mutual funds. Trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments. Restatement (Third) of Trusts § 100 cmt. b(1) (2012).

90.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are significantly lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, *Not Your Normal Nest Egg*, The Wall Street Journal, March 2013.

91.    Due to their potential to reduce overall plan costs, collective trusts have become widely popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds). Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014).[11]

92.    Criticisms leveled against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure, and the units are valued daily; as a result, participants invested in collective trusts can track the daily performance of their investments online. *See* Paula Aven Gladych, *CITs Gaining Ground in 401(k)*

---

[11] Available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf .

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

*Plans*, Employee Benefit News (Apr. 14, 2016) (herein, "CITs Gaining Ground").[12]
Many if not most mutual fund strategies are available in collective trust format, and
the investments in the collective trusts are identical to those held by the mutual
fund. *Id.* And because collective trusts contract directly with the plan, and provide
regular reports regarding costs and investment holdings, the Plan has the same level
of protection that the Investment Company Act provides to individual investors.
Also, collective trusts are subject to state and federal banking regulations that
provide comparable protections. American Bankers Association, *ABA Primer on
Bank Collective Funds*, at 1 (June 2015).

93.     In fact, as Joseph F. Martel, a multi-asset portfolio specialist for T.
Rowe Price has publicly stated, the T. Rowe Price Retirement Trusts collective trust
has "'the same portfolio management team, glidepath, subasset-class exposure,
tactical allocation overlay and underlying investments' as the mutual fund-based T.
Rowe Price Retirement Funds target-date series." *See CIT Target Date Assets
Surging As Mutual Funds Hit Outflows*, Pension & Investments (June 24, 2019). Mr.
Martel also explained that, depending on various factors such as total assets, the
collective investment trust pricing can be as low as 32 basis points across all years
while fees for the comparable mutual fund-based series run 38-59 basis points

---

[12]  Available  at  https://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans  (last
visited Mar. 26, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

depending on the target date years. *See id.* Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

94.     Indeed, according to data compiled by Morningstar, both T. Rowe Price and Fidelity saw mutual target date fund assets decline between 2017 and 2018, while their collective investment trust target date business grew. *See CIT Target Date Assets Surging As Mutual Funds Hit Outflows*, Pension & Investments (June 24, 2019). T. Rowe Price specifically had net outflows of $23 billion in 2017 and 2018, from its target date mutual funds and $21.4 billion of net outflows into its collective investment target date investments. *See id.* However, Defendants missed out on this trend.

95.     The investment options offered within the Plan throughout the Class Period were overwhelmingly pooled investment products known as mutual funds.

96.     As demonstrated on the charts below, Defendants failed to prudently monitor the Plan to determine whether the Plan offered the available collective trust version of their investment options, the lowest-cost collective trust option, or the lowest-cost share class investments for the Plan's assets.

97.     In simple terms, for almost every T. Rowe Price investment option in the Plan, Defendants failed to consider switching to an identical investment option

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

that was packaged in a "different wrapper" at a lower price, which would have allowed a higher investment return for the participants.

98.     As illustrated on the chart below, which uses recent publicly available data, each of the T. Rowe Price funds selected by Defendants was more expensive by a significant margin than the available lower-cost institutional share class and the less expensive collective trust fund options.

99.     With respect to the Plan's T. Rowe Price funds, Defendants included the investor share class funds as investment options in the Plan even though the Plan was eligible for both: (a) the lower-cost institutional share class (which was available as an option starting in 2015); and (b) a lower cost collective trust option. In every instance, the 3-year return of both lower cost options meets or exceeds the return of the more expensive investment option chosen by Defendants.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## Table VIII.A.3.1

| Fund in Plan | Expense Ratio[13] | In Plan 3-Year Return | Identical Lower-Cost Share Class | Expense Ratio | 3-Year Return | % Fee Excess |
|---|---|---|---|---|---|---|
| TRRFX $337,343 T. Rowe Price Retirement 2005 | 0.53% | 5.12% | TRPFX T. Rowe Price Retirement I 2005 I | 0.37% | 5.24% | 41% |
| | | | TRP Retirement Trust B 2005 | 0.40% | 5.28% | 35% |
| TRRAX $3,000,017 T. Rowe Price Retirement 2010 | 0.55 | 5.24% | TRPAX T. Rowe Price Retirement I 2010 I | 0.37% | 5.47% | 48% |
| | | | TRP Retirement Trust B 2010 | 0.40% | 5.52% | 38% |
| TRRGX $3,751,851 T. Rowe Price Retirement 2015 | 0.55% | 5.57% | TRFGX T. Rowe Price Retirement I 2015 I | 0.40% | 5.72% | 38% |
| | | | TRP Retirement Trust B 2015 | 0.40% | 5.80% | 38% |
| TRRBX $25,594,560 T. Rowe Price Retirement 2020 | 0.58% | 5.93% | TRBRX T. Rowe Price Retirement I 2020 I | 0.43% | 6.03% | 35% |
| | | | TRP Retirement Trust B 2020 | 0.40% | 6.16% | 45% |
| TRRHX $30,288,422 T. Rowe Price Retirement 2025 | 0.62% | 6.21% | TRPHX T. Rowe Price Retirement I 2025 I | 0.47% | 6.29% | 32% |
| | | | TRP Retirement Trust B 2025 | 0.40% | 6.45% | 55% |
| TRRCX $50,474,113 T. Rowe Price Retirement 2030 | 0.65% | 6.30% | TRPCX T. Rowe Price Retirement I 2030 I | 0.49% | 6.48% | 32% |
| | | | TRP Retirement Trust B 2030 | 0.40% | 6.66% | 63% |
| TRRJX $24,245,364 T. Rowe Price Retirement 2035 | 0.68% | 6.51% | TRPJX T. Rowe Price Retirement I 2035 I | 0.50% | 6.60% | 33% |
| | | | TRP Retirement Trust B 2035 | 0.40% | 6.83% | 70% |
| TRRDX $33,471,787 T. Rowe Price Retirement 2040 | 0.70% | 6.63% | TRPDX T. Rowe Price Retirement I 2040 I | 0.51% | 6.72% | 36% |
| | | | TRP Retirement Trust B 2040 | 0.40% | 6.95% | 75% |

---

[13] All 3-year return figures and expense ratios for the T. Rowe Price Retirement Trust-B funds are from Morningstar Investment Profiles as of June 30, 2020.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| Fund in Plan | Expense Ratio | In Plan 3-Year Return | Identical Lower-Cost Share Class | Expense Ratio | 3-Year Return | % Fee Excess |
|---|---|---|---|---|---|---|
| TRRKX $17,122,066 T. Rowe Price Retirement 2045 | 0.71% | 6.61% | TRPKX T. Rowe Price Retirement I 2045 I | 0.52% | 6.66% | 37% |
| | | | TRP Retirement Trust B 2045 | 0.40% | 6.95% | 78% |
| TRRMX $12,468,243 T. Rowe Price Retirement 2050 | 0.71% | 6.62% | TRPMX T. Rowe Price Retirement I 2050 I | 0.59% | 6.67% | 37% |
| | | | TRP Retirement Trust B 2050 | 0.40% | 6.90% | 78% |
| TRRNX $11,215,738 T. Rowe Price Retirement 2055 | 0.71% | 6.54% | TRPMX T. Rowe Price Retirement I 2055 I | 0.59% | 6.68% | 20% |
| | | | TRP Retirement Trust B 2055 | 0.40% | 6.91% | 78% |
| TRRLX $3,522,462 T. Rowe Price Retirement 2060 | 0.72% | 6.56% | TRPLX T. Rowe Price Retirement I 2060 I | 0.52% | 6.71% | 20% |
| TRRIX $1,121,629 T. Rowe Price Retirement income Fund | 0.51% | 5.08% | TRPTX T. Rowe Price Retirement Balanced I | 0.35% | 5.21%[14] | 46% |
| PRGIX $50,995,688 T. Rowe Price Growth & Income | 0.65% | 8.87% | TGTIX T. Rowe Price Growth & Income I | 0.56% | 8.97% | 20% |
| RPMGX $66,110,710 T. Rowe Price Mid-Cap Growth | 0.75% | 11.27% | RPTIX T. Rowe Price Mid-Cap Growth I | 0.61% | 11.42% | 23% |
| PRGFX $33,945,944 T. Rowe Price Growth Stock | 0.66% | 16.43% | PRUFX T. Rowe Price Growth Stock I | 0.52% | 17.42% | 30% |
| MADVX $14,011,347 BlackRock Equity Dividend Instl. Benchmark: Russell 1000 Value TR USD | 0.71% | 3.37 %[15] | MKDVX BlackRock Equity Dividend K Benchmark: Russell 1000 Value TR USD | 0.59 % | 3.49 % | 83% |

100.   The chart above also demonstrates that other T. Rowe Price investment options in the Plan – the Retirement Balanced Fund, Growth & Income Fund, Mid-Cap Growth Fund, Growth Stock Fund– were all available in a lower-cost share

---

[14] Performance and expense ratios from T. Rowe Price Fact Sheet dated June 30, 2020.
[15] Return data BlackRock Equity Dividend I and K shares as of September 30, 2020.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

classes, the performance of which also met or exceeded the performance of the more expensive share class offered to Plan participants.

101.   The Plan did not receive any additional services or benefits based on its use of more expensive share classes. The only consequence was higher costs for Plan participants.

102.   The $600 million Plan, with tens of millions of dollars invested in many of its individual investment options, easily qualified for these lower cost investment options. Purchase and sale of the I-share class typically requires a $1 million minimum initial investment, and there is no minimum for additional purchases. However, the minimum initial investment generally is waived for retirement plans. *See*, *e.g.*, Prospectus dated 10/01/2019 for T. Rowe Price I 2005 Fund I Class, at 26.

103.   At the beginning of the Class Period, T. Rowe Price required a $50 million minimum amount for investing in target date collective trust series. T. Rowe Price lowered the minimum amount for investing in target date collective trust series to $20 million in target date assets in 2017.

104.   At all times during the Class Period, the Plan had sufficient assets invested in T. Rowe Price target date funds to meet the minimum investment thresholds to qualify to invest in the collective trust target date funds.

105.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

transferred the Plan's investments in the above-referenced retail investor class shares and N-class collective trust into institutional class I shares and the cheaper F class collective trust at the earliest opportunity. The fact that the Plan has invested in at least one collective trust during the Class Period indicates that the Plan Document does not prohibit investing in these types of funds.

106.   Thus, Defendants could have used the Plan's bargaining power to obtain significantly lower-cost alternatives to mutual funds, in order to obtain the best possible prices for the Plan. By failing to investigate the use of lower cost share classes and CITs, Defendants caused the Plan and its participants to pay millions of dollars per year in unnecessary fees.

107.   Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

108.   Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998) (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").[16]

109. Defendants did not utilize separate accounts during the Class Period.

**Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Alternative Lower Cost Funds**

110. The Supreme Court has reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

111. The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting *Nat'l Conference of Comm'rs on Uniform State Laws*, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that

---

[16] Available at:
https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (last visited Oct. 21, 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

"'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

112.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

113.    When large plans, like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

114.   The Plan has retained numerous actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, shown in the tables below, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs. For example, during the Class Period the Plan included only two index funds, which attracted less than 8% of the Plan's assets for the year ending December 31, 2018. Form 5500 for 2018.

115.   During the Class Period, the Plan lost millions of dollars by offering investment options that had similar, if not identical, characteristics to lower-priced investment options.

116.   Upon information and belief, virtually all investment options in the Plan remained the same until December 2019.[17]

117.   Using services that are readily available to ERISA fiduciaries, including Morningstar, to analyze the current Plan offerings as reported in the Form 5500 for the year ended December 31, 2019, Plaintiffs' analysis shows each T. Rowe Price fund was significantly more expensive than comparable funds found in similarly-sized plans (*i.e.*, plans having $500 million to $1 billion in assets).

---

[17] After a long period during which very little change was made to the Plan, effective December 12, 2019, Defendants removed two investment options (PNC Small Cap Institutional and Vanguard Total Int. Stock Ind. Adm.) and added seven new investment options.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

118.   The expense ratios for the T. Rowe Price funds offered in the Plan are as much as 700% greater than the expense ratio for comparable funds that employ the same investment strategies and have at least 90 percent similar holdings and are available to the Plan. *See* Chart below. *See also*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69  (March 2018) (hereafter, "ICI Study").[18]

119.   The tables below show that for each of the T. Rowe Price Retirement funds offered in the Plan, there were substantially cheaper alternatives that offered the same or better performance. Had Defendants undertaken regular reviews of the Plan's investment offerings and alternative investments that are readily available to large defined benefits plans like the Plan, they would have (a) realized that the investments offered by the Plan were too expensive; (b) determined that they could obtain better returns for Plan participants at a lower cost; and (c) removed these expensive investment offerings in favor of lower-cost, often better performing options like those shown in the tables below:

---

[18] *See* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## Table VIII.B.1

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRIX $1,452,708 T. Rowe Price Retirement Balanced Benchmark: Morningstar Mod Con Tgt Risk TR USD | 0.50 %[19] | 7.91 % | 5.67 % | 6.65 % | -0.32 % | -0.57 % | -0.33 % |
| Low Fee Alternative | TRPTX T. Rowe Price Retirement Balanced I Benchmark: Morningstar Mod Con Tgt Risk TR USD | 0.35 % | 8.09 % | 5.83 % | 6.76 % | -0.14 % | -0.42 % | -0.23 % |
| Low Fee Alternative | VSCGX Vanguard LifeStrategy Cnsrv. Gr. Inv. Benchmark: Morningstar Mod Con Tgt Risk TR USD | 0.12 % | 8.11 % | 6.43% | 7.02% | -0.11 % | 0.19 % | 0.04 % |
| Low Fee Alternative | VTMFX Vanguard Tax-Managed Balanced Adm Benchmark: Morningstar Mod Con Tgt Risk TR USD | 0.09 % | 10.39 % | 8.24 % | 8.74 % | 2.17 % | 1.99 % | 1.75 % |
| Low Fee Alternative | TRILX TIAA-CREF Lifecycle Index Ret Inc Instl Benchmark: Morningstar Mod Con Tgt Risk TR USD | 0.10 % | 9.09 % | 6.59 % | 6.98 % | 0.86 % | 0.34 % | 0.00 |

## Table VIII.B.2

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRFX $337,343 T. Rowe Price Retirement 2005 Benchmark: Morningstar Lifetime Mod 2010 TR USD | 0.52% | 7.45% | 5.62% | 6.74% | -0.55% | -0.60% | 0.01% |
| Low Fee Alternative | TRPFX T. Rowe Price Retirement I 2005 I Benchmark: Morningstar Lifetime Mod 2010 TR USD | 0.37% | 7.62% | 5.74% | 6.82% | -0.38% | -0.47% | 0.09% |

---

[19] Expense ratios for "In Plan" investment options are per *Meritor Inc. Savings Plan and Investment Disclosure,* November 2019 (as updated on Morningstar as of October 2020).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## Table VIII.B.3

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRAX $3,000,017 T. Rowe Price Retirement 2010 Benchmark: Morningstar Lifetime Mod 2010 TR USD | 0.52% | 7.85 % | 5.86 % | 7.18 % | -0.15 % | -0.35% | 0.45% |
| Low Fee Alternative | TRPAX T. Rowe Price Retirement I 2010 I Benchmark: Morningstar Lifetime Mod 2010 TR USD | 0.37% | 7.96% | 6.00% | 7.31% | -0.04% | -0.21% | 0.57% |
| Low Fee Alternative | FKIFX Fidelity Freedom® Index 2010 Investor Benchmark: Morningstar Lifetime Mod 2010 TR USD | 0.12% | 7.95% | 6.29% | 6.89% | -0.05% | 0.07% | 0.15% |

## Table VIII.B.4

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRGX $3,751,851 T. Rowe Price Retirement 2015 Benchmark: Morningstar Lifetime Mod 2015 TR USD | 0.55% | 8.14 % | 6.13%% | 7.75% | -0.30% | -0.48% | 0.48% |
| Low Fee Alternative | TRFGX T. Rowe Price Retirement I 2015 I Benchmark: Morningstar Lifetime Mod 2015 TR USD | 0.40% | 8.34% | 6.25% | 7.87% | -0.10% | -0.36% | 0.60% |
| Low Fee Alternative | TLFIX TIAA-CREF Lifecycle Index 2015 Instl Benchmark: Morningstar Lifetime Mod 2015 TR USD | 0.10% | 9.34% | 6.81% | 7.62% | 0.90% | 0.20% | 0.35% |
| Low Fee Alternative | FLIFX Fidelity Freedom® Index 2015 Investor Benchmark: Morningstar Lifetime Mod 2015 TR USD | 0.12% | 8.59% | 6.74% | 7.66% | 0.15% | 0.13% | 0.39% |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## Table VIII.B.5

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **IN PLAN** | TRRBX $25,594,560 T. Rowe Price Retirement 2020 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.57% | 8.64% | 6.49% | 8.49% | 0.05% | -0.37% | 0.68% |
| *Low Fee Alternative* | TRBRX T. Rowe Price Retirement I 2020 I Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.42% | 8.66 % | 6.60% | 8.61% | 0.07% | -0.27% | 0.80% |
| *Low Fee Alternative* | TLWIX TIAA-CREF Lifecycle Index 2020 Instl Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.10% | 9.58% | 7.07% | 8.17% | 0.99% | 0.20% | 0.36% |
| *Low Fee Alternative* | FPIFX Fidelity Freedom Index 2020 Investor Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.12 % | 9.04% | 7.04% | 8.21% | 0.45% | 0.17% | 0.40% |

## Table VIII.B.6

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **IN PLAN** | TRRHX $30,288,422 T. Rowe Price Retirement 2025 Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.61% | 9.31% | 6.86% | 9.14% | 0.91% | -0.12% | 0.77% |
| *Low Fee Alternative* | TRPHX T. Rowe Price Retirement I 2025 I Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.46% | 9.29% | 6.93% | 9.23% | 0.89% | -0.05% | 0.86% |
| *Low Fee Alternative* | TLQIX TIAA-CREF Lifecycle Index 2025 Instl Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.10% | 10.03% | 7.39% | 8.82% | 1.63% | 0.41% | 0.45% |
| *Low Fee Alternative* | FQIFX Fidelity Freedom Index 2025 Investor Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.12% | 9.43% | 7.30% | 8.71% | 1.03% | 0.32% | 0.35% |
| *Low Fee Alternative* | SSBSX State Street Target Retirement 2025 K | 0.09% | 10.11% | 7.53% | 9.12% | 1.71% | 0.54% | 0.75% |

47

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Benchmark: Morningstar Lifetime Mod 2025 TR USD | | | | | | | |

## Table VIII.B.7

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRCX $50,474,113 T. Rowe Price Retirement 2030 Benchmark: Morningstar Lifetime Mod 2030TR USD | 0.64% | 9.69% | 7.13% | 9.68% | 1.89% | 0.24% | 0.79% |
| Low Fee Alternative | TRPCX T. Rowe Price Retirement I 2030 I Benchmark: Morningstar Lifetime Mod 2030TR USD | 0.49% | 9.75% | 7.24% | 9.78 % | 1.96% | 0.35% | 0.90% |
| Low Fee Alternative | TLHIX TIAA-CREF Lifecycle Index 2030 Instl Benchmark: Morningstar Lifetime Mod 2030TR USD | 0.10% | 10.40% | 7.69% | 9.44% | 2.60% | 0.80% | 0.55% |
| Low Fee Alternative | FXIFX Fidelity Freedom Index 2030 Investor Benchmark: Morningstar Lifetime Mod 2030TR USD | 0.12% | 9.88% | 7.74% | 9.76% | 2.08% | 0.88% | 0.88% |
| Low Fee Alternative | SSBYX State Street Target Retirement 2030 K Benchmark: Morningstar Lifetime Mod 2030TR USD | 0.09% | 11.92% | 8.23% | 9.92% | 4.12% | 1.34% | 1.04% |

## Table VIII.B.8

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRJX $24,245,364 T. Rowe Price Retirement 2035 Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.67% | 10.13 % | 7.32 % | 10.08 % | 3.34 % | 0.77 % | 0.88 % |
| Low Fee Alternative | TRPJX T. Rowe Price Retirement I 2035 I Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.50% | 10.11% | 7.43% | 10.17% | 3.32% | 0.89% | 0.98% |
| Low Fee Alternative | SSCKX | 0.09% | 12.17% | 8.34% | 10.32% | 5.38% | 1.80% | 1.13% |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| | State Street Target Retirement 2035 K Benchmark: Morningstar Lifetime Mod 2035 TR USD | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Low Fee Alternative | TLYIX TIAA-CREF Lifecycle Index 2035 Instl Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.10% | 10.75% | 7.95% | 10.03% | 3.96% | 1.41% | 0.84% |
| Low Fee Alternative | FIHFX Fidelity Freedom Index 2035 Investor Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.12% | 10.17% | 7.98% | 10.45% | 3.38% | 1.43% | 1.25% |

## Table VIII.B.9

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRDX $33,471,787 T. Rowe Price Retirement 2040 Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.69% | 10.47% | 7.52% | 10.42% | 4.60% | 1.37% | 1.13% |
| Low Fee Alternative | TRPDX T. Rowe Price Retirement I 2040 I Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.51% | 10.55 % | 7.62% | 10.52% | 4.67% | 1.47% | 1.23% |
| | Average Net Expense Ratio for Morningstar Category Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.465% | | | | | | |
| Low Fee Alternative | FBIFX Fidelity Freedom® Index 2040 Investor Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.12% | 10.38% | 8.00% | 10.48% | 4.50% | 1.85% | 1.19% |
| Low Fee Alternative | TLZIX TIAA-CREF Lifecycle Index 2040 Instl Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.10% | 11.00% | 8.14% | 10.58% | 5.13% | 2.00% | 1.29% |
| Low Fee Alternative | SSCQX State Street Target Retirement 2040 K Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.09% | 12.34% | 8.36% | 10.55% | 6.46% | 2.21% | 1.26% |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## Table VIII.B.10

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRKX $17,122,066 T. Rowe Price Retirement 2045 Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.71% | 10.72 % | 7.59 % | 10.54 % | 5.44 % | 1.77 % | 1.30 % |
| Low Fee Alternative | TRPKX T. Rowe Price Retirement I 2045 I Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.51% | 10.59% | 7.64% | 10.60 % | 5.31% | 1.81% | 1.36% |
| Low Fee Alternative | FIOFX Fidelity Freedom® Index 2045 Investor Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.12% | 10.37% | 8.00% | 10.48% | 5.09% | 2.18% | 1.24% |
| Low Fee Alternative | TLXIX TIAA-CREF Lifecycle Index 2045 Instl Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.10% | 11.26% | 8.25% | 10.80% | 5.97% | 2.43% | 1.56% |
| Low Fee Alternative | SSDEX State Street Target Retirement 2045 K Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.09% | 12.16% | 8.29% | 10.74% | 6.88% | 2.46% | 1.50% |

## Table VIII.B.11

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | TRRMX $12,468,243 T. Rowe Price Retirement 2050 Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.71% | 10.65% | 7.58% | 10.53% | 5.64% | 1.95% | 1.37% |
| Low Fee Alternative | TRPMX T. Rowe Price Retirement I 2050 I Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.52% | 10.70% | 7.66% | 10.61% | 5.69% | 2.02% | 1.45% |
| Low Fee Alternative | FIPFX Fidelity Freedom® Index 2050 Investor Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.12% | 10.38% | 8.00% | 10.49% | 5.37% | 2.36% | 1.33% |
| Low Fee Alternative | SSDLX | 0.09% | 12.31% | 8.30% | 10.72% | 7.29% | 2.67% | 1.56% |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | State Street Target Retirement 2050 K<br>Benchmark: Morningstar Lifetime Mod 2050 TR USD | | | | | | | |
| *Low Fee Alternative* | TLLIX<br>TIAA-CREF Lifecycle Index 2050 Instl<br>Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.10% | 11.26% | 8.27% | 10.89% | 6.25% | 2.64% | 1.72% |

## Table VIII.B.12

| In Plan/<br>Low Fee<br>Alternative | Fund | Net<br>Expense<br>Ratio | Trailing Annual Return<br>as of September 30, 2020 | | | Performance Relative to Benchmark<br>as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **IN PLAN** | TRRNX $11,215,738<br>T. Rowe Price<br>Retirement 2055<br>Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.71% | 10.50 % | 7.51% | 10.48 % | 5.61 % | 2.00% | 1.60% |
| *Low Fee Alternative* | TRPMX<br>T. Rowe Price<br>Retirement I 2055 I<br>Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.52% | 10.70% | 7.66% | 10.61% | 5.69% | 2.02% | 1.45% |
| *Low Fee Alternative* | FDEWX<br>Fidelity Freedom®<br>Index 2055 Investor<br>Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.12% | 10.38% | 8.00% | 10.49% | 5.37% | 2.36% | 1.33% |
| *Low Fee Alternative* | SSDQX<br>State Street Target<br>Retirement 2055 K<br>Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.09% | 12.16 % | 8.30% | 10.74% | 7.27% | 2.79% | 1.64% |
| *Low Fee Alternative* | TTIIX<br>TIAA-CREF Lifecycle<br>Index 2055 Instl<br>Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.10% | 11.23% | 8.28% | 10.97% | 6.34% | 2.77% | 1.86% |

## Table VIII.B.13

| In Plan/<br>Low Fee<br>Alternative | Fund | Net<br>Expense<br>Ratio | Trailing Annual Return<br>as of September 30, 2020 | | | Performance Relative to Benchmark<br>as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **IN PLAN** | TRRLX $3,522,462<br>T. Rowe Price<br>Retirement 2060<br>Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.71% | 10.53 % | 7.52 % | 10.48 % | 5.75 % | 2.12 % | 1.45% |
| *Low Fee Alternative* | TRPLX | 0.52% | 10.66% | 7.66% | 10.54% | 5.88% | 2.26% | 1.51% |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | T. Rowe Price Retirement I 2060 I<br>Benchmark: Morningstar Lifetime Mod 2060 TR USD | | | | | | |
| *Low Fee Alternative* | FDKLX<br>Fidelity Freedom® Index 2060 Investor<br>Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.12% | 10.35% | 7.98% | 10.48% | 5.57% | 2.58% | 1.44% |
| *Low Fee Alternative* | SSDYX<br>State Street Target Retirement 2060 K<br>Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.09% | 12.20% | 8.26% | 10.68% | 7.42% | 2.87% | 1.65% |
| *Low Fee Alternative* | TVIIX<br>TIAA-CREF Lifecycle Index 2060 Instl<br>Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.10% | 11.37% | 8.34% | 11.06% | 6.59% | 2.95% | 2.03% |

120.    The comparisons in the tables above demonstrate that for every T. Rowe Price Retirement fund selected by Defendants for the Plan, there are many equivalent investments that use the same benchmark index and have substantially similar holdings, but would cost participants far less – and enable participants to save more money for retirement – than the funds imprudently selected for and retained in the Plan by Defendants.

121.    The tables above are not intended to serve as an exhaustive listing of lower-cost, better performing alternative investments, but rather to illustrate that throughout the Class Period there were numerous superior alternatives, including lower cost versions of the exact same T. Rowe Price Retirement funds offered in the Plan. Defendants' failure to ascertain these facts and replace the Plan's investment lineup with readily available, lower-cost, better performing funds is strong evidence of a flawed fiduciary process.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

122.   As shown above, the T. Rowe Price Retirement funds selected by Defendants have expense ratios that range from 0.50% to 0.71%.[20] Tables VIII.B.1-13, above, demonstrate that comparable retirement funds from fund families including Fidelity, State Street, and TIAA-CREF offer expense ratios that range from 0.09% to 0.12%, and provide superior performance over 1-, 3-, and 5-year periods, *i.e.*, the majority of the Class Period. Despite the availability of these lower-cost, better performing alternatives, Defendants chose target date funds with expense ratios that are 4.16 times to 7.88 times greater than alternative funds that would have provided superior returns.

123.   The tables below show that for the T. Rowe Price, BlackRock, and Dodge & Cox stock funds offered in the Plan, there were substantially cheaper alternatives that offered the same or better performance. Had Defendants done regular reviews of the Plan's investment offerings and alternative investments that are readily available to large defined benefits plans like the Plan, they would have (a) realized that the investments offered by the Plan were too expensive; (b) determined that they could obtain better returns for Plan participants at a lower cost;

---

[20] Defendants may claim that the expense ratios are 0.25% lower than reported, asserting that such amount is rebated to the Plan and/or its participants through revenue sharing arrangements with T. Rowe Price. The imprudence of Plan's practice of using revenue sharing to pay for certain expenses of the Plan is addressed below in paragraphs 131-44. Moreover, even if such amounts were rebated to the Plan and its participants, the Plan's investment options would still have expense ratios that are significantly greater than the non-T. Rowe Price comparator funds used herein.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

and (c) removed these expensive investment offerings in favor of lower-cost, better performing options like those shown in the tables below:

## Table VIII.B.14

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | RPMGX $66,110,710 T. Rowe Price Mid-Cap Growth Benchmark: Russell Mid Cap Growth TR USD | 0.74% | 13.28 % | 12.65 % | 13.82 % | -9.95 % | -3.57 % | -1.70 % |
| Low Fee Alternative | PMEGX T. Rowe Price Instl Mid-Cap Equity Gr Benchmark: Russell Mid Cap Growth TR USD | 0.61% | 13.43 % | 12.79 % | 13.97 % | -9.80% | -3.43 % | -1.56 % |
| Low Fee Alternative | VMGMX Vanguard Mid-Cap Growth Index Admiral Benchmark: Russell Mid Cap Growth TR USD | 0.070% | 22.58 % | 14.83 % | 14.03% | -0.65 % | -1.40 % | -1.49 % |

## Table VIII.B.15

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | PRGIX $50,995,688 T. Rowe Price Growth & Income Benchmark: Russell 1000 TR USD | 0.64 % | 11.47 % | 11.17 % | 12.69 % | -4.54% | -1.20% | -1.40% |
| Low Fee Alternative | TGTIX T. Rowe Price Growth & Income I Benchmark: Russell 1000 TR USD | 0.56 % | 11.55 % | 11.26 % | 12.77 % | -4.46 % | -1.11 % | -1.33 % |
| Low Fee Alternative | FXAIX Fidelity® 500 Index Benchmark: Russell 1000 TR USD | 0.015% | 15.14 % | 12.27 % | 14.14 % | -0.87 % | -0.11 % | 0.04% |
| Low Fee Alternative | DFUSX DFA US Large Company I Benchmark: Russell 1000 TR USD | 0.08% | 15.09 % | 12.22 % | 14.09 % | -0.92% | -0.16 % | -0.01 % |
| Low Fee Alternative | VTCIX Vanguard Tax-Managed Capital App I | 0.06 % | 16.00 % | 12.42 % | 14.28 % | -0.02 | 0.04 % | 0.18 % |

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| | Benchmark: Russell 1000 TR USD | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

## Table VIII.B.16

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio[21] | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | PRGFX $33,945,944 T. Rowe Price Growth Stock Benchmark: Russell Growth 1000 TR USD | 0.65 % | 34.55 % | 18.85 % | 18.43 % | -2.98 % | -2.82 % | -1.67% |
| Low Fee Alternative | PRUFX T. Rowe Price Growth Stock I Benchmark: Russell Growth 1000 TR USD | 0.52 % | 34.71 % | 19.01 % | 18.60 % | -2.82 % | -2.67 % | -1.50 % |
| Low Fee Alternative | VIGIX Vanguard Growth Index Institutional Benchmark: Russell Growth 1000 TR USD | 0.04 % | 38.25% | 21.03 % | 19.25 % | 0.72 % | -0.64 % | -0.85 % |
| Low Fee Alternative | MSEQX Morgan Stanley Inst Growth I Benchmark: Russell Growth 1000 TR USD | 0.59 % | 99.39 % | 38.12 % | 30.51 | 61.85 % | 16.45 % | 10.41 % |
| Low Fee Alternative | MKFOX BlackRock Large Cap Focus Growth K Benchmark: Russell Growth 1000 TR USD | 0.62 % | 42.08 % | 23.23 % | 20.28 % | 4.55 % | 1.56 % | 0.17 % |

## Table VIII.B.17

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | MADVX $14,011,347 BlackRock Equity Dividend Ins Benchmark: Russell 1000 Value TR USD | 0.71% | -4.10 % | 3.37 % | 8.82 % | 0.92 % | 0.74 % | 1.17 % |
| Low Fee Alternative | MKDVX BlackRock Equity Dividend K Benchmark: Russell 1000 Value TR USD | 0.59 % | -4.03 % | 3.49 % | 8.94 % | 0.99 % | 0.86 % | 1.28 % |

---

[21] Expense ratios as of October 2020.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

| Low Fee Alternative | VEIRX Vanguard Equity-Income Adm Benchmark: Russell 1000 Value TR USD | 0.18 % | -2.77 % | 4.66 % | 9.45 % | 2.25 % | 2.03 % | 1.79 % |
|---|---|---|---|---|---|---|---|---|
| Low Fee Alternative | AFMFX American Funds American Mutual F3 Benchmark: Russell 1000 Value TR USD | 0.29 % | 2.61 % | 6.94 % | 10.56 % | 7.64 % | 4.31 % | 2.90 % |
| Low Fee Alternative | MEIKX MFS Value R6 Benchmark: Russell 1000 Value TR USD | 0.47 % | -1.05 % | 4.45 % | 9.07 % | 3.98 % | 1.82 % | 1.41 % |
| Low Fee Alternative | PEIIX Principal Equity Income Inst Benchmark: Russell 1000 Value TR USD | 0.52 % | -2.13 % | 6.53 % | 10.56 % | 2.89 % | 3.90 % | 2.91 % |

## Table VIII.B.18

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Trailing Annual Return as of September 30, 2020 | | | Performance Relative to Benchmark as of September 30, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| IN PLAN | DODFX $4,189,446 Dodge & Cox International Stock Benchmark: MSCI ACWI Ex USA Value NR USD | 0.63% | -9.43 % | -5.85 % | 2.21 % | -1.40 % | -0.77 % | 0.07 % |
| Low Fee Alternative | VTRIX Vanguard International Value Inv. Benchmark: MSCI ACWI Ex USA Value NR USD | 0.37 | -4.07 % | -1.62 % | 4.45 % | 6.77 % | 3.46% | 2.31 % |

124.   The comparisons in the tables above demonstrate that for each T. Rowe Price stock fund and the BlackRock Equity Dividend Institutional and Dodge & Cox International stock funds selected by Defendants in the Plan, there are many equivalent investments that use the same benchmark index and have substantially similar holdings, but would cost participants far less – and enable participants to save more money for retirement – than the funds imprudently selected for and retained in the Plan by Defendants.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

125.   The tables above are not intended to serve as an exhaustive listing of lower-cost, better performing alternative stock funds, but rather to illustrate that throughout the Class Period there were numerous superior alternatives, including lower cost versions of the exact same T. Rowe Price Retirement and BlackRock funds offered in the Plan. Defendants' failure to ascertain these facts and replace the Plan's investment lineup with readily available, lower-cost, better performing funds is strong evidence of a flawed fiduciary process.

126.   The comparisons in the tables above demonstrate that for every T. Rowe Price stock fund selected by Defendants for the Plan, there are many equivalent investments that would cost participants far less – and enable them to make more money for retirement – than the funds selected for the Plan by Defendants.

127.   The chart above demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable alternative funds in the same investment style. A reasonable investigation by the Plan's fiduciaries would have revealed the existence of these lower-cost alternatives.

128.   Defendants cannot justify their selection and retention of these over-priced stock funds on the basis that their performance has been superior to the lower cost investment options. On the contrary, during the Class Period the T. Rowe Price stock funds offered by the Plan failed to perform any better than far less expensive investment options offered by numerous fund families, including Vanguard,

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

Fidelity, Dimensional Fund Advisors ("DFA"), Morgan Stanley, MFS Investment Management, and American Funds. *See* Tables VIII.B.14-18, above.

129.   Likewise, the high expense ratios of the other T. Rowe Price mutual funds offered by the Plan are not justified by their returns. For each of these funds -- the T. Rowe Price Growth Stock, T. Rowe Price Mid Cap Growth, and the T. Rowe Price Retirement Balanced Investor, all with expense ratios of 0.51-0.66%, there were alternative funds available with expense ratios that were a fraction of the expense ratios of the T. Rowe Price Funds. *See* Alternative Funds Chart.

130.   Defendants cannot justify their selection and retention of the T. Rowe Price Growth Stock, T. Rowe Price Mid Cap Growth and the T. Rowe Price Retirement Balanced Investor funds on the grounds that their performance has been superior to the lower cost investment options like the Schwab Total Stock Market Index (0.03%) and the Vanguard LifeStrategy Cnsrv. Growth Investor funds. On the contrary, during the Class Period the T. Rowe Price funds failed to outperform these far less expensive options.

### Defendants Failed to Monitor or Control the Plan's Recordkeeping and Other Administrative Expenses

131.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to

participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

132. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

133. According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the*

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

*mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[22]

134.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

135.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

136.    However, if revenue sharing was the basis for Defendants' decision to select higher-cost shares it was a poor decision. Indeed, the Employee Benefits Security Administration of the U.S. Dept. of Labor ("DOL") has explained that, to comply with their fiduciary duties under ERISA,

> the responsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly to [the service provider] for services is

---

[22] Available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

reasonable, taking into account the services provided to the plan as well as all fees or compensation received by [the service provider] in connection with the investment of plan assets, including any revenue sharing.

DOL Advisory Opinion 2013–03A (July 3, 2013).

137.   It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

138.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

139.   Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

140.   Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

141.  Defendants have failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Defendants permitted the Plan to pay its recordkeeper, T. Rowe Price Retirement Plan Services, Inc. ("T. Rowe Price"), the following per participant recordkeeping during the Class Period:[23]

| Year | No. Participants | Recordkeeping Fees | Per Participant |
|------|------------------|--------------------|-----------------|
| 2014 | 4,524 | ■ | ■ |
| 2015 | 4,440 | -- | -- |
| 2016 | 4,459 | ■ | ■ |
| 2017 | 4,986 | ■ | ■ |
| 2018 | 5,295 | -- | -- |
| 2019 | 4,919 | ■ | ■ |
|      |       | Average: | ■ |

142.  By way of comparison, other plans pay far less for recordkeeping. One data source, the *401k Averages Book* (20th ed. 2020), studies Plan fees for smaller plans, those under $200 million in assets. Although it studies smaller plans than the Plan, it is nonetheless a useful resource because one can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping. That is because recordkeeping and administrative fees should *decrease* as a Plan increases in size. For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per

---

[23] The amounts of recordkeeping fees for 2015 and 2018 have been left blank because Plaintiffs presently do not have sufficient data for those years.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

participant. *401k Averages Book* at p. 95. A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant. *Id*. at p. 108. Thus, using direct recordkeeping costs to make an apples-to-apples comparison, the Plan, with over a $600 million in assets and nearly 5,000 participants during the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not. Instead, the per participant recordkeeping fees averaged more than **$90** during the Class Period.

143.   Looking at the Plan's total expenses for administration costs also reveals fiduciary breaches. The total amount of administrative fees (both through direct and indirect payments) ranged between an estimated ▮▮▮ per participant in 2016 and ▮▮▮ per participant in 2019. The total administrative fees include advisors' and consultants' fees, recordkeeping, and other service providers.

144.   Given the increase in size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper, T. Rowe Price, to the Plan. On information and belief, T. Rowe Price has performed the following tasks for the Plan:

64

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

- Receives the Plan contributions;

- Credits accounts for those contributions; and

- Pays benefits to participants and/or their beneficiaries.

145.  In other words, the services provided by T. Rowe Price were nothing out of the ordinary. A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

## <u>FIRST CLAIM FOR RELIEF</u>

### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against Meritor and Committee Defendants)

146.  Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

147.  At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

65

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

148.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

149.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of T. Rowe Price mutual funds in the Plan. In addition, the Prudence Defendants failed to offer the lowest cost collective trusts as alternatives to mutual funds. The Prudence Defendants also failed to investigate separate accounts even though they generally provide the same investment management services at a lower cost. The Prudence Defendants also caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

150.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

151.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

152.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Meritor and the Board Defendants)

153.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

154.   Meritor and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

155.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

156.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Meritor and the Board Defendants.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

157.   Meritor and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)   failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

158.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Meritor and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

159.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Meritor and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

REDACTED VERSION OF DOCUMENT TO BE SEALED, FILED PURSUANT TO LR 5.3(b)(3)(B)

Dated: April 16, 2021          By: */s/ David H. Fink*
                        David H. Fink (P28235)
                        Nathan J. Fink (P75185)
                        FINK BRESSACK
                        38500 Woodward Ave., Suite 350
                        Bloomfield Hills, MI 48304
                        Phone: (248) 971-2500
                        Fax: (248) 971-2600
                        dfink@finkbressack.com
                        nfink@finkbressack.com

                        Eric Lechtzin (Federal Bar I.D. # 62096PA)
                        Mark H. Edelson
                        **EDELSON LECHTZIN LLP**
                        3 Terry Drive, Suite 205
                        Newtown, PA 18940
                        Telephone: (215) 867-2399
                        Facsimile: (267) 685-0676
                        elechtzin@edelson-law.com
                        medelson@edelson-law.com

                        *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 16, 2021, I electronically filed the foregoing paper with the Clerk of the court using the ECF system, which will send notification of such filing to all counsel of record registered for electronic filing.

FINK BRESSACK

By: /s/Nathan J. Fink
David H. Fink (P28235)
Nathan J. Fink (P75185)
38500 Woodward Ave; Suite 350
Bloomfield Hills, MI  48304
Telephone: (248) 971-2500
nfink@finkbressack.com